IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD J. LYNCH, II, | ) | CASE NO.  1:21-CV-00556-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Richard J. Lynch, II ("Plaintiff" or "Lynch"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In June 2015, Lynch filed an application for POD and DIB, alleging a disability onset date of January 6, 2015 and claiming he was disabled due to depression, hypothyroidism, migraine headaches, and severe lumbar back pain into his right hip.  (Transcript ("Tr.") at 66, 79, 1227.)  The application was denied initially and upon reconsideration, and Lynch requested a hearing before an administrative law judge ("ALJ").  (*Id.*)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On December 20, 2017, an ALJ held a hearing, during which Lynch, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On May 7, 2018, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 15-26.) The ALJ' s decision became final on February 21, 2019, when the Appeals Council declined further review. (*Id.* at 1-6.) Lynch sought judicial review of the Commissioner's final decision. (*Id.* at 1227.) On judicial review, this Court reversed and remanded the decision for further proceedings. (*Id.*)

Before this Court remanded, Lynch filed a subsequent claim for Title II and Title XVI benefits, which was granted as of December 7, 2019.[2] (*Id.*)

On November 13, 2020, an ALJ held a hearing, during which Lynch, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.* at 1227-28.) On November 23, 2020, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 1227-51.) Lynch did not appeal to the Appeals Council. (Doc. No. 14 at 2.)

On March 10, 2021, Lynch filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 14, 16-17.) Lynch asserts the following assignments of error:

(1) The appointment of Andrew Saul as the Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.

(2) The ALJ erroneously failed to follow the remand order of this Court and properly evaluate the opinion of Dr. Vore. The ALJ also erred when he found that the testimony of the vocational witness was consistent with Ruling 00-4p.

(3) The ALJ erred in forming the RFC when he failed to properly evaluate the evidence documenting the combination of Lynch's severe impairments and the related pain.

---

[2] Therefore, the relevant period at issue in this decision is January 6, 2015 through December 6, 2019. (Transcript ("Tr.") at 1227 n.1.)

(4)  The ALJ committed harmful error when he failed to properly consider the totality of the evidence in this matter in accordance with SSR 16-3p.

(Doc. No. 14 at 1.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Lynch was born in December 1964 and was 50 years-old at the time of his alleged disability onset date (Tr. 1249), making him a person closely approaching advanced age under Social Security regulations. *See* 20 C.F.R. § 404.1563(d).  He has at least a high school education and is able to communicate in English.  (Tr. 1249.)  He has past relevant work as a spot welder, metal stamping laborer, and general warehouse laborer.  (*Id.*)

### B.     Relevant Medical Evidence[3]

In February 2015, Lynch's diagnoses included hypothyroidism, lumbar spinal stenosis, lumbar stenosis with neurogenic claudication, s/p lumbar spinal fusion, and spondylolisthesis of the lumbar region.  (*Id.* at 441.)  His active problems included chronic depression, anxiety, and chronic migraines. (*Id.* at 441-42.)

Lynch participated in physical therapy from February to April 2015.  (*Id.* at 429, 446-564.)  Lynch failed to attend at least three sessions.  (*Id.* at 429.)  On March 10, 2015, Lynch reported he felt his fatigue was his biggest problem, as a trip to Walmart wore him out.  (*Id.* at 531.)  However, he had unloaded 15 bundles of eco bricks that weighed 14 pounds a bundle on Saturday and on Sunday he broke up the ice in his driveway with a pole pick.  (*Id.*)  After all this activity, Lynch reported "'just a little soreness'" on his

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

left side.  (*Id.*)  On March 17, 2015, Lynch reported his pain was now a 1-3/10 on average.  (*Id.* at 525.)  On April 16, 2015, Lynch reported he had worked outside in his yard all day the day before and was having increased pain in his right low back.  (*Id.* at 451.)  Lynch said he pushed through his pain and kept working, and then was very sore the rest of the day.  (*Id.*)  However, Lynch reported feeling better at the end of his therapy session.  (*Id.*)  Travis Eylser, PTA, noted Lynch was able to complete the program without a significant increase in back pain and that Lynch had reduced pain and stiffness after the session.  (*Id.* at 458.)

On May 4, 2015, Lynch saw Don Moore, M.D., for his second post-op visit after his L3-L4 laminectomy in February 2015.  (*Id.* at 924.)  Lynch reported severe back pain that he rated as a 6/10 and described as aching, numbing, and stabbing, although his leg pain had been resolved.  (*Id.*)  Lynch told Dr. Moore everything made his pain worse and nothing relieved it, and that he had to stop physical therapy a few weeks ago because he did not have the money to continue.  (*Id.*)  Lynch told Dr. Moore he walked for ten yards at most, and he could only sit for a few minutes.  (*Id.*)  On examination, Dr. Moore found a well-healed incision, decreased soft tissue swelling over the incision, a "great deal of rigidity" with lumbar flexion, significant pain to palpation over the spinous process, normal muscle bulk and tone, normal strength in the lower extremities, normal sensation, and normal gait with the ability to heel and toe walk.  (*Id.* at 927.)  Dr. Moore noted Lynch was not doing as well as hoped, and Lynch appeared stressed about many things that could not be addressed in his office setting.  (*Id.* at 927-28.)  Dr. Moore opined that based on Lynch's pain, it was "unreasonable for him to go back to work at this point" and he was unable to predict when Lynch could return to work.  (*Id.* at 927.)  Dr. Moore noted he was "greatly concerned" about Lynch's overall recovery and wanted to refer him back to Dr. Zumbar for pain management or the chronic pain rehabilitation clinic at main campus.  (*Id.*)

A June 3, 2015 x-ray revealed post-surgical changes and fusion with laminectomy similar to prior

4

imaging, with unchanged lucency around the upper most screws and Grade 1 anterolisthesis of the lumbar spine with flexion.  (*Id.* at 706-07.)

On June 6, 2015, Lynch saw Zachary Zumbar, M.D., for follow up regarding his low back and leg pain.  (*Id.* at 673.)  Lynch rated his pain as a 7/10 and described it as sharp and burning.  (*Id.*)  The pain was located in his low back and it radiated into his right hip and pelvis, although it did not go down his leg.  (*Id.*)  Lynch reported the pain was "severely impacting his ability to function" and it was very difficult for him to bend forward.  (*Id.*)  Lynch told Dr. Zumbar he had been using Norco and Toradol, which helped some, although they were "in no way eliminating the pain to a point that he can function at a normal level."  (*Id.*)  Lynch tried using Neurontin, but it caused too many side effects.  (*Id.*)  On examination, Dr. Zumbar found severe tenderness in the lower lumbar paraspinal muscles and sacroiliac joint on the right.  (*Id.* at 674.)  Dr. Zumbar noted pain with back extension and flexion.  (*Id.*)  Dr. Zumbar further found normal strength, muscle tone, sensation, and reflexes.  (*Id.*)  Dr. Zumbar ordered a steroid injection on the right sacroiliac joint for Lynch's next visit, and continued Lynch's current medications as they gave him enough pain relief to maintain his activities of daily living.  (*Id.*)

On June 26, 2015, Lynch saw Dr. Zumbar for follow up.  (*Id.* at 671.)  Lynch reported using the Norco and Toradol, but the only took the edge off his pain.  (*Id.*)  Lynch told Dr. Zumbar he had seen surgeon Dr. Moore, who told him there was nothing more to be done surgically and recommended he go through the chronic pain rehab program at the Cleveland Clinic.  (*Id.*)  Lynch complained of constant back pain that was worse with activity and was "severely impacting his ability to be active."  (*Id.*)  On examination, Dr. Zumbar found severe tenderness in the lower lumbar paraspinal muscles and sacroiliac joint on the right.  (*Id.* at 672.)  Dr. Zumbar further found normal strength, muscle tone, and sensation. (*Id.*)  While Lynch's reflexes were diminished, they were symmetric.  (*Id.*)  Dr. Zumbar determined Lynch's symptoms were consistent with a combination of lumbar spondylolisthesis, lumbar degenerative

5

disc disease, lumbar neuritis, sacrum disorder, and postlaminectomy syndrome of the lumbar spine.  (*Id.*) Dr. Zumbar noted "significant issues with anxiety and depression," which, while not the primary cause of Lynch's symptoms, were "definitely . . . a contributing factor."  (*Id.*)  Dr. Zumbar continued Lynch's pain medications and started him on Lyrica.  (*Id.*)  Dr. Zumbar noted Lynch could not afford steroid injections or the chronic pain rehab program at the time.  (*Id.*)

On July 24, 2015, Lynch saw Dr. Zumbar for follow up of his low back pain, which he rated as a 6/10.  (*Id.* at 669.)  Lynch reported he had tried using Lyrica, but it caused too many cognitive side effects, so he stopped it.  (*Id.*)  Lynch told Dr. Zumbar he had been using Norco intermittently, but it did not seem to help very much.  (*Id.*)  On examination, Dr. Zumbar found right sided lumbar and sacroiliac tenderness, pain with facet loading, normal strength and muscle tone, intact sensation, and diminished but symmetric reflexes.  (*Id.* at 670.)  Dr. Zumbar stopped Lyrica and Norco and started Lynch on Percocet.  (*Id.*)  Dr. Zumbar noted he still thought Lynch's anxiety and depression were "a significant contributing factor." (*Id.*)  Dr. Zumbar thought a second opinion was a good idea and provided Lynch with a referral.  (*Id.*)

On July 29, 2015, Lynch saw Vernon Vore, M.D., to discuss his back pain.  (*Id.* at 597.)  Lynch reported some sciatic pain down the front of his right thigh about two weeks before; while it was not constant or as bad as it had been before his surgery, it was enough to let him know it was there.  (*Id.*) Lynch told Dr. Vore he was unable to cut wood or mow his lawn, which was upsetting him.  (*Id.*)  On examination, Dr. Vore found Lynch could bend almost to touch his ankles but he was very slow going down and coming back up, and it was "visibly painful."  (*Id.* at 598.)  Dr. Vore further found modest tenderness with spots that were "quite painful to palpation" along Lynch's scar, with more tenderness to the right of the spine base in an angle out to the sacroiliac joint.  (*Id.* at 598-99.)  Dr. Vore further found normal motor function, absent left ankle jerk, and negative straight leg raise except for hamstring tightness, right more than left.  (*Id.* at 599.)  Dr. Vore noted Lynch's anger could affect his perception of

his back pain.  (*Id.*)  Lynch stated he intended to begin counseling in a few weeks.  (*Id.*)

On September 25, 2015, Lynch treated at the Crystal Clinic Orthopaedic Center.  (*Id.* at 620.)  On examination, treatment providers found no rashes or lesions, normal gait, limited lumbar range of motion, positive femoral stretch and straight leg raise tests on the right, full and painless range of motion of the bilateral hips and knees, deficient sensation at the L3-S1 levels on the right and the L4-S1 levels on the left, and decreased reflexes of the patellar tendons and Achilles bilaterally.  (*Id.* at 620-21.)  Treatment providers diagnosed Lynch with degenerative spondylolisthesis.  (*Id.* at 621.)

An October 6, 2015 MRI revealed degeneration and mild disc bulging at the L3-L4 level above the fusion site, as well as minimal disc bulging without encroachment at L2-L3.  (*Id.* at 570-71.)

On October 16, 2015, Lynch saw Douglas Ehrler, M.D., for evaluation of his lower back and right leg pain.  (*Id.* at 623.)  Lynch reported leaning on a cart when shopping, and that his pain was worse with driving, lifting, bending, walking, sitting, standing, changing positions, and extended inactivity.  (*Id.*)  Lynch told Dr. Ehrler he had tried pain medication, rest, activity modification, and home exercise, none of which alleviated his pain, although Lynch reported Percocet initially helped.  (*Id.*)  On examination, Dr. Ehrler found a normal gait with no assistive device and normal motor function, sensation, and reflexes.  (*Id.* at 625-26.)  Dr. Ehrler ordered a CT of the lumbar spine and noted he would proceed with non-surgical options, including anti-inflammatories, physical therapy, epidural injections, and microdiscectomy at this time.  (*Id.* at 627.)

On November 20, 2015, Lynch saw Dr. Ehrler for follow up.  (*Id.* at 629.)  On examination, Dr. Ehrler found a normal gait with no assistive device and normal motor function, sensation, and reflexes.  (*Id.* at 631-32.)  Dr. Ehrler told Lynch his "condition is progressive and the amount of strength that returns is correlated with how weak and how long the patient was weak prior to surgery."  (*Id.* at 632.)  Dr. Ehrler noted Lynch was going to think about surgery and prescribed Relaten.  (*Id.*)

On December 15, 2015, Lynch underwent surgical intervention to remove and reinsert hardware, and a revision of his prior laminectomy and spinal fusion.  (*Id.* at 638-41, 960-68.)

On January 8, 2016, Lynch saw Dr. Ehrler for his first postop visit.  (*Id.* at 642.)  Lynch reported being sore but doing well and told Dr. Ehrler all his leg pain was gone.  (*Id.*)  On examination, Dr. Ehrler found a normal gait, normal motor strength, normal sensation, normal reflexes, and intact balance.  (*Id.* at 644.)  Dr. Ehrler told Lynch he could increase activity as tolerated.  (*Id.* at 645.)

On February 15, 2016, Lynch saw Dr. Zumbar for follow up regarding his low back pain, which Lynch rated as a 7/10 and described as an aching and burning sensation.  (*Id.* at 667.)  Lynch reported since he last saw Dr. Zumbar, he had undergone revision surgery on his back.  (*Id.*)  Despite the surgery, Lynch told Dr. Zumbar his pain remained persistent, if not worse.  (*Id.*)  Lynch denied numbness, tingling, weakness, and any loss of bladder or bowel control.  (*Id.*)  On examination, Dr. Zumbar found bilateral lower lumbar and sacroiliac tenderness, normal strength, normal muscle tone, intact sensation, and normal and symmetric reflexes.  (*Id.* at 668.)  Dr. Zumbar diagnosed Lynch with post-laminectomy syndrome and recommended he reconsider pain rehabilitation.  (*Id.*)  Dr. Zumbar prescribed Kadian and noted that he thought Lynch's condition was salvageable, but further surgical intervention – and likely medication as well – was not the answer.  (*Id.*)

On March 14, 2016, Lynch saw Dr. Zumbar for follow up.  (*Id.* at 757.)  Lynch rated his low back pain as a 4/10 and described his pain as a constant, sharp, burning sensation.  (*Id.*)  While the Kadian helped for the first week, Lynch reported it just seemed to make him tired now.  (*Id.*)  Lynch told Dr. Zumbar he was sleeping for 18 hours a day and his depression had been worse.  (*Id.*)  Lynch denied any radiating pain to his extremities, numbness, tingling, weakness, or loss of bladder or bowel control.  (*Id.*)  On examination, Dr. Zumbar found right sided lumbar paraspinal tenderness, normal strength, normal muscle tone, intact sensation, and diminished but symmetric reflexes.  (*Id.* at 758.)  Dr. Zumbar noted that

8

he thought Lynch's depression was a "big factor" in Lynch's pain. (*Id.*) Dr. Zumbar again recommended the pain rehabilitation program. (*Id.*) Dr. Zumbar stopped Kadian and ordered a trial of Zonegram. (*Id.*)

On April 8, 2016, Lynch saw Dr. Ehrler for his 16-week post-op visit. (*Id.* at 749.) Lynch reported no leg pain but complained of lower back pain, which had increased since his last visit. (*Id.*) On examination, Dr. Ehrler found normal gait, full motor strength, intact sensation, and normal reflexes. (*Id.* at 751.) Dr. Ehrler told Lynch x-rays taken that day revealed a solid fusion and noted Lynch had no activity restrictions. (*Id.* at 752.) Dr Ehrler reminded Lynch that his surgery was only for his leg pain, and noted Lynch "understands, agrees and is happy." (*Id.* at 754.)

On June 27, 2016, Lynch saw Dr. Zumbar for follow up of his right-sided lower back pain. (*Id.* at 770.) Lynch rated his back pain as a 5-7/10 and told Dr. Zumbar his symptoms had been persistent and unchanged since his last visit. (*Id.*) Lynch reported having seen a neurologist for a second opinion and who tried him on Trileptal, but Lynch had to stop the medication after it caused cognitive side effects. (*Id.*) Lynch denied radiating pain, numbness, tingling, weakness, or any loss of bladder or bowel control. (*Id.*) On examination, Dr. Zumbar found severe right-sided lower lumbar and sacroiliac tenderness, normal strength and muscle tone, intact sensation, and normal and symmetric reflexes. (*Id.* at 771.) Dr. Zumbar ordered a trial of baclofen but felt that chronic pain rehabilitation would "be far and away" the best treatment for Lynch. (*Id.*) Unfortunately, Lynch's insurance would not cover it. (*Id.*)

On August 23, 2016, Lynch saw Dr. Zumbar for follow up. (*Id.* at 773.) Lynch rated his pain as an 8/10 and described it as aching and sore. (*Id.*) Lynch reported the pain was bilateral, although it was more on his right than his left. (*Id.*) Lynch told Dr. Zumbar he had seen a pain management specialist who thought Lynch could be a candidate for a spinal cord stimulator or an intrathecal pump but wanted Lynch to try more injections first. (*Id.*) Lynch reported having to stop baclofen because it made him too tired. (*Id.*) Lynch denied neurologic symptoms and loss of bladder or bowel control. (*Id.*) On

9

examination, Dr. Zumbar found severe right-sided lower lumbar and sacroiliac tenderness, normal strength and muscle tone, intact sensation, and symmetric reflexes.  (*Id.* at 774.)  Dr. Zumbar felt it was reasonable to proceed with a right sacroiliac injection at Lynch's next visit.  (*Id.*)

On September 2, 2016, Lynch underwent a sacroiliac joint injection.  (*Id.* at 775-76.)

On September 20, 2016, Lynch saw Dr. Zumbar for follow up.  (*Id.* at 779.)  Lynch rated his back pain as a 7/10 and described it as sharp.  (*Id.*)  Lynch reported minimal benefit from the sacroiliac injection.  (*Id.*)  On examination, Dr. Zumbar found severe right-sided lower lumbar and sacroiliac tenderness, normal strength and muscle tone, intact sensation, and normal and symmetric reflexes.  (*Id.* at 780.)  Dr. Zumbar thought it unlikely further injections would be beneficial and was not "nearly as optimistic" about an intrathecal pump or stimulator as he was chronic pain rehabilitation, but Lynch's insurance would not cover the rehab program.  (*Id.*)  Lynch reported wanting to hold off on further treatment at the time, which Dr. Zumbar thought was reasonable.  (*Id.*)

On February 20, 2017, Lynch saw Dr. Vore for follow up of his back pain.  (*Id.* at 820.)  Lynch reported twisting his back while fixing a kitchen sink.  (*Id.*)  On examination, Dr. Vore found full range of motion of the hips and neck and tenderness along the spine and shoulder girdle.  (*Id.* at 822.)  Dr. Vore prescribed Flexeril.  (*Id.*)

On March 13, 2017, Lynch saw Dr. Zumbar for follow up of his multifocal pain.  (*Id.* at 787.)  Lynch rated his pain as a 7/10 and reported that while his worst pain was in his right low back, he was also having pain in his knees, elbows, upper back, and neck.  (*Id.*)  On examination, Dr. Zumbar found bilateral thoracic and severe right-sided and moderate left-sided lumbar paraspinal tenderness, normal strength and muscle tone, intact sensation, and diminished but symmetric reflexes.  (*Id.* at 788.)  Dr. Zumbar noted he was going to check inflammatory markers, along with a rheumatoid factor and ANA, to screen for an autoimmune process.  (*Id.*)  Dr. Zumbar further noted he was going to check recent imaging of Lynch's

10

knees, neck, and upper back.  (*Id.*)

A cervical spine x-ray taken that same day revealed slight loss of cervical lordosis, which may be from muscle spasm, as well as minimal narrowing of the C5-C6 disc of uncertain significance, and no foraminal narrowing.  (*Id.* at 791.)

On April 10, 2017, Lynch saw Dr. Zumbar for follow up.  (*Id.* at 1130.)  Lynch rated his pain as a 10/10.  (*Id.*)  On examination, Dr. Zumbar found diffuse myofascial tenderness in the cervical, thoracic, and lumbar regions, normal strength and muscle tone, intact sensation, and diminished but symmetric reflexes.  (*Id.* at 1131.)  Dr. Zumbar noted Lynch's symptoms were consistent with fibromyalgia and post-laminectomy syndrome.  (*Id.*)  Dr. Zumbar started Lynch on a trial of Skelaxin for muscle spasms.  (*Id.*)  Dr. Zumbar referred Lynch to a rheumatologist to evaluate for lupus, Sjogren's, or other connective tissue disorder because Lynch's ANA was positive.  (*Id.*)

On May 22, 2017, Lynch saw Dr. Vore for completion of disability paperwork.  (*Id.* at 817.)  On examination, Lynch could bend over and reach almost to his ankles and could pick up a 25-pound chair, although not repetitively.  (*Id.* at 819.)

That same day, Dr. Vore completed a Physical Capabilities Questionnaire, in which he opined Lynch must alternate between sitting, standing, and walking all day at 20-30 minute intervals.  (*Id.* at 373-74.)

On August 23, 2017, Lynch saw Dr. Paul Agee for chiropractic treatment.  (*Id.* at 1156-57.)  Lynch reported severe lower back pain that was sharp in nature.  (*Id.* at 1156.)  On examination, Lynch walked with a normal base and stride, and he could tandem walk and walk on heels and toes.  (*Id.*)  Dr. Agee found intact sensation, negative Romberg's sign, normal muscle tone and strength, and symmetrical reflexes.  (*Id.*)  All active cervical and lumbar ranges of motion were limited by pain.  (*Id.*)

On August 28, 2017, Lynch saw David Stainbrook, Jr., D.O., for follow up.  (*Id.* at 1159.)  Lynch

11

reported not doing well and complained of feeling like he had sand in his eyes, occasional rash, and occasional rash from sun exposure.  (*Id.*)  Lynch told Dr. Stainbrook he had fallen while walking a dog a week ago and said he hurt all over and had a headache.  (*Id.*)  On examination, Dr. Stainbrook found normal strength, normal gait, sensory deficit, and paresthesias in the right lower extremity.  (*Id.* at 1161.)  Dr. Stainbrook noted Lyrica had been stopped because of suicidal thoughts and another medication had been stopped because Lynch experienced symptoms of a heart attack.  (*Id.* at 1162.)  Dr. Stainbrook further noted there was no evidence of active CTD, CVD, inflammatory arthritis, SLE, or Sjogren's syndrome.  (*Id.*)

On September 26, 2017, Lynch saw Dr. Zumbar for pain management of back pain Lynch rated as an 8/10.  (*Id.* at 1187.)  Lynch reported that his back pain had been persistent and stable.  (*Id.*)  While Lynch told Dr. Zumbar his back pain was "still greatly limiting his function," Lynch had not had much pain in his other joints.  (*Id.*)  Lynch reported he had tried Skelaxin but had to stop because it made him very tired.  (*Id.*)  On examination, Dr. Zumbar found no lumbar paraspinal tenderness, normal strength and muscle tone, intact sensation, and diminished but symmetric reflexes.  (*Id.* at 1188.)  Dr. Zumbar determined Lynch's symptoms were consistent with paraspinal spasm and postlaminectomy syndrome.  (*Id.*)  Since Dr. Zumbar felt "[t]he majority of [Lynch's] symptoms appear[ed] to be mechanical," he prescribed Daypro, a stronger anti-inflammatory.  (*Id.*)

On November 20, 2017, Lynch saw Dr. Zumbar for follow up regarding his low back and knee pain, which Lynch rated as a 6/10.  (*Id.* at 1195.)  Lynch reported the Daypro had been "mildly helpful," although it helped his back pain more than his knee pain.  (*Id.*)  On examination, Dr. Zumbar found "severe" lower lumbar and sacroiliac tenderness on the right, tenderness over the medial joint lines of the knees bilaterally, intact sensation, diminished but symmetric reflexes, normal strength, and normal muscle tone.  (*Id.*)  Dr. Zumbar opined that Lynch's symptoms were consistent with a combination of

12

postlaminectomy syndrome and fibromyalgia.  (*Id.* at 1196.)

Lynch received chiropractic treatment through the end of 2017.  (*Id.* at 1207-09.)

On January 29, 2019, Lynch saw Dr. Zumbar for follow up.  (*Id.* at 1688.)  Lynch complained of pain in all joints from head to toe, although the worst pain was in the right side of his low back.  (*Id.*) Lynch rated his pain as an 8/10.  (*Id.*)  Lynch reported sulindac had been somewhat helpful, but he was "still having a significant amount of discomfort."  (*Id.*)  On examination, Dr. Zumbar found "severe" lower lumbar tenderness on the right exacerbated with facet loading, intact sensation except for diminished sensation in the posterior aspect of the occiput, diminished but symmetric reflexes, normal strength, and normal muscle tone.  (*Id.* at 1689.)  Dr. Zumbar noted they would proceed with a right L5-S1 facet injection and ordered a cervical MRI.  (*Id.*)

On February 14, 2019, a cervical spine MRI revealed no significant central canal stenosis in the cervical spine.  (*Id.* at 1664-65.)

On February 26, 2019, Lynch saw Dr. Zumbar for follow up of his right-sided back pain.  (*Id.* at 1667.)  Lynch rated his pain as a 5/10.  (*Id.*)  Lynch had received a right L5-S1 facet injection at his last appointment and reported he received 100% improvement for the first twelve hours after his shot.  (*Id.*) After that, his pain returned to its previous level.  (*Id.*)  On examination, Dr. Zumbar found mild upper cervical paraspinal tenderness, significant right-side lower lumbar paraspinal tenderness exacerbated with facet loading, normal strength, normal muscle tone, intact sensation, and symmetric reflexes.  (*Id.* at 1667-68.)

On March 25, 2019, Lynch saw Dr. Zumbar for follow up of his right-sided back pain.  (*Id.* at 1670.)  Lynch rated his pain as a 7/10.  (*Id.*)  Lynch had received a right L5-S1 facet injection at his last appointment and reported he received 100% improvement for the first twelve hours after his shot.  (*Id.*) After that, his pain returned to its previous level.  (*Id.*)  On examination, Dr. Zumbar found severe right-

13

side lower lumbar paraspinal tenderness exacerbated with facet loading, normal strength, normal muscle tone, intact sensation, and symmetric reflexes. (*Id.* at 1671.) Dr. Zumbar noted he would proceed with a right L4 and L5 medial branch radiofrequency ablation at his next visit. (*Id.*)

On May 6, 2019, Lynch saw Dr. Zumbar for follow up of his low back and multi-joint pain, which Lynch rated as a 7-8/10. (*Id.* at 1673.) Lynch reported an 80% improvement in his low back pain since receiving a radiofrequency ablation of the right L5-S1 facet joint at his last appointment. (*Id.*) While his back ached if he was especially active, Lynch reported the severe sharp pain he had before was gone. (*Id.*) Dr. Zumbar noted Lynch was "very pleased with the relief he got." (*Id.*) Lynch's main complaint consisted of his joint pain, particularly his knees and right shoulder. (*Id.*) Dr. Zumbar noted Lynch got modest relief from anti-inflammatories and had been through physical therapy. (*Id.*) On examination, Dr. Zumbar found no lumbar tenderness, normal strength and muscle tone, pain with abduction of the right shoulder but full range of motion, intact sensation, and diminished but symmetric reflexes. (*Id.* at 1674.) Dr. Zumbar determined Lynch's symptoms were consistent with osteoarthritis of the knees and right shoulder. (*Id.*) Dr. Zumbar noted Lynch's back pain from his lumbosacral spondylolysis had been "well addressed" with the recent radiofrequency ablation. (*Id.*) Dr. Zumbar ordered MRIs of Lynch's knees and right shoulder. (*Id.*)

On July 2, 2019, Lynch saw Dr. Zumbar for follow up regarding his knee pain. (*Id.* at 1676.) Lynch rated his pain as a 5-8/10 and reported he had not noticed any real difference from physical therapy. (*Id.*) Lynch told Dr. Zumbar he had tested positive for Sjogren's syndrome. (*Id.*) While Lynch was still experiencing back pain, he was "still considerably improved following the" radiofrequency ablation. (*Id.*) On examination, Dr. Zumbar found some diffuse myofascial tenderness, no severe tenderness, full strength, normal muscle tone, intact sensation, and diminished but symmetric reflexes. (*Id.* at 1677.) Dr. Zumbar ordered MRIs of the bilateral knees. (*Id.*)

14

A July 29, 2019, MRI of the right knee revealed a horizontal tear of the posterior horn into the body of the lateral meniscus, mild degenerative changes, and a small joint effusion.  (*Id.* at 1679-80.)  An MRI of the left knee taken that same day revealed mild degenerative changes.  (*Id.* at 1680-81.)

On August 6, 2019, Lynch saw Dr. Zumbar for follow up.  (*Id.* at 1683.)  Lynch reported more left-side lower back pain since his last visit.  (*Id.*)  Since the pain was similar to what he had on the right side, he wondered if he could have a radiofrequency ablation on the left.  (*Id.*)  Lynch further reported continued knee pain, although the sulindac helped to some extent.  (*Id.*)  On examination, Dr. Zumbar found left-side lower lumbar paraspinal tenderness exacerbated with facet loading, normal strength, normal muscle tone, intact sensation, and symmetric reflexes.  (*Id.* at 1684.)  Dr. Zumbar noted that since Lynch was having similar pain on his left side as he did on his right, and since he had "substantial relief" from the radiofrequency ablation on the right, he would proceed with a left L5-S1 facet injection on the left at his next visit.  (*Id.*)  Dr. Zumbar offered to refer Lynch to orthopedics for his knee pain, but Lynch was not interested in knee surgery at the time, which Dr. Zumbar felt was reasonable.  (*Id.*)

On September 16, 2019, Lynch saw Dr. Stainbrook for complaints of constant, allover pain and discomfort.  (*Id.* at 1511.)  Dr. Stainbrook noted Lynch was "being evaluated for an unstable chronic illness that increase [sic] morbidity and mortality."  (*Id.*)  Lynch reported a "horrible" energy level and a rash on his arms that had been biopsied by a dermatologist.  (*Id.*)  Lynch also complained of dry mouth that was helped with water and dry eyes, for which Dr. Stainbrook recommended over the counter treatments.  (*Id.*)  Lynch further reported muscle pain, neck pain, and headaches.  (*Id.*)  On examination, Dr. Stainbrook found decreased range of motion and tenderness of the right and left shoulders and right and left knee, decreased range of motion of the right and left wrists and ankles, and tenderness of the right and left upper arms.  (*Id.* at 1512.)  Dr. Stainbrook further found normal motor skills, normal strength, intact cranial nerves, a sensory deficit, normal gait, paresthesias of the right lower extremity, and rash of

15

the bilateral forearms.  (*Id.* at 1513.)  Dr. Stainbrook noted Lynch might have SCLE with photosensitivity. (*Id.* at 1514.)  Lynch's diagnoses included Sjogren's syndrome with keratoconjunctivitis sicca and fibromyalgia.  (*Id.*)  Dr. Stainbrook noted Lynch's ANA was positive on repeat testing.  (*Id.*)  Lynch's SSA was also positive.  (*Id.*)

On September 17, 2019, Lynch saw Dr. Zumbar for follow up of his low back pain.  (*Id.* at 1686.) Lynch rated his pain as a 5/10.  (*Id.*)  Lynch reported 100% pain relief for the first four hours after his last left L5-S1 facet injection.  (*Id.*)  After that, his symptoms returned, although they were intermittent, and most of the time he was pain free.  (*Id.*)  Lynch reported a few instances of right sided back pain, although it had been fleeting.  (*Id.*)  Lynch told Dr. Zumbar he was still using sulindac, which remained "moderately helpful" in controlling his pain.  (*Id.*)  On examination, Dr. Zumbar found subtle right-sided lower lumbar paraspinal tenderness exacerbated with facet loading, full strength, normal muscle tone, intact sensation, and normal and symmetric reflexes.  (*Id.* at 1687.)  Dr. Zumbar noted, "The left sided pain has been improved substantially following the facet injection.  He is starting to have some return of pain on the right side.  He had undergone a radiofrequency ablation six months ago, which has been effective up until now."  (*Id.*)  Since Lynch reported his pain was manageable, Dr. Zumbar decided to hold off on any further injections for now.  (*Id.*)

On October 4, 2019, Lynch saw Dr. Stainbrook for follow up.  (*Id.* at 1494.)  Lynch reported he was doing okay but he had a low energy level.  Lynch also complained of dry mouth, back pain, joint pain, muscle pain, neck pain, and headache.  (*Id.*)  Lynch reported artificial tears were helping his dry eyes.  (*Id.*)  On examination, Dr. Stainbrook found decreased range of motion and tenderness of the knees bilaterally, as well as decreased range of motion of the left wrist and the bilateral ankles.  (*Id.* at 1495.) Dr. Stainbrook further found normal motor skills, normal strength, intact cranial nerves, a sensory deficit, normal gait, paresthesias of the right lower extremity, and rash of the bilateral forearms.  (*Id.* at 1513.)

16

On November 11, 2019, Lynch attended a pain management appointment for follow up of his right knee pain that he rated a 9/10.  (*Id.* at 1643.)   Lynch also complained of lumbar spinal pain, but his knee was his biggest problem.  (*Id.*)  On examination, treatment providers found normal strength and tenderness over the medial and lateral joint lines of the right knee.  (*Id.* at 1646.)

On December 17, 2019, Lynch attended another pain management follow up appointment of his knee pain and diffuse myofascial pain.  (*Id.* at 1639.)  Lynch reported received an injection from Dr. Yoder and was set to see him again next month.  (*Id.*)  Lynch complained of worsening mood since he was not as active because of his pain.  (*Id.*)   Lynch reported he had stopped taking one of his medications because it made him feel like a zombie.  (*Id.*)  Lynch's diagnoses consisted of fibromyalgia and failed back syndrome, and he was started on gabapentin.  (*Id.* at 1642.)

From 2015 through 2019, Lynch received mental health treatment at Appleseed Community Mental Health Center.  (*Id.* at 398-425, 921-22, 1518-68, 1613-27.)  At these sessions, Lynch consistently reported tolerating his medication well, interrupted sleep, and depression and anxiety symptoms.  (*Id.* at 398-425, 921-22, 1518-68.)  On examination, treatment providers consistently found normal eye contact, cooperative behavior, depressed, sad, and anxious mood, affect that was appropriate to mood, normal perception, associations, thought process, and insight and judgment.  (*Id.*)  At times, treatment providers noted short attention span and impaired concentration.  (*Id.* at 1544, 1555, 1566.)

## C.    State Agency Reports

On November 12, 2015, Gary Hinzman, M.D., opined Lynch could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 71-72.)  Lynch's ability to push and/or pull was unlimited, other than shown for lift and/or carry.  (*Id.* at 72.)  Dr. Hinzman further opined Lynch could frequently climb ramps/stairs, occasionally climb ladders, ropes, or scaffolds, frequently

stoop, kneel, and crouch, and occasionally crawl. (*Id.*) Lynch's ability to balance was unlimited. (*Id.*) Lynch needed to avoid even moderate exposure to hazards. (*Id.* at 73.)

On February 24, 2016, Theresa March, D.O., affirmed Dr. Hinzman's findings, except Dr. March found Lynch could never climb ladders, ropes, or scaffolds and could occasionally stoop and kneel. (*Id.* at 89-90.)

On November 15, 2015, Katherine Fernandez, Psy.D., opined Lynch was capable of concentrating on simple to multistep tasks, but he may have some limitation in maintaining pace when distracted by his surroundings. (*Id.* at 74.) Dr. Fernandez further opined Lynch could work in a setting where pace can vary and there are no strict quotas. (*Id.*) Lynch should work in a setting with no more than occasional changes to routine and environment. (*Id.* at 75.)

On January 25, 2016, Paul Tangeman, Ph.D., affirmed Dr. Fernandez' findings, except Dr. Tangeman opined Lynch was capable of being around others on a frequent and superficial basis. (*Id.* at 91-92.)

## D.   **Hearing Testimony**

During the November 13, 2020 hearing, Lynch testified to the following:

- He held a driver's license and only had problems driving distances of an hour to an hour and twenty minutes. (*Id.* at 1269-70.)

- His constant pain keeps him from working. (*Id.* at 1278.) His pain is at his waist, so he cannot twist, bend, or lean without a great deal of discomfort. (*Id.*) He cannot do heavy lifting like he used to. (*Id.*) He cannot get down on his back to work, and even getting on his hands and knees is difficult. (*Id.*) He cannot sit for long without having to get up and walk around, and he cannot walk for long without having to sit down. (*Id.*)

- He had undergone two back surgeries, and while he was able to walk, he lost his job and was in constant pain. (*Id.* at 1280.) He underwent physical therapy, but the physical therapist told him he was wasting his time as nothing was going to help his back pain. (*Id.*) He also underwent spinal injections. (*Id.*) The injections helped a

18

little bit for a few weeks, but then his pain returned to its original level. (*Id.* at 1281.) He has taken multiple medications, but none of them have worked. (*Id.*)

- He was diagnosed with Sjogren's syndrome two years ago. (*Id.*) His immune system attacks his body, and it causes dry eyes, dry mouth, skin lupus with sun exposure, fatigue, and "man breasts." (*Id.* at 1281-82.) He naps on a daily basis from an hour and a half to two hours up to 12 hours. (*Id.* at 1282.) It is hard for him to get out of bed. (*Id.*) He does not get a full night's sleep because of his pain. (*Id.* at 1283.)

- He receives mental health treatment for his depression, anxiety, and anger issues. (*Id.*) He self-isolates more because his pain has made him very grumpy. (*Id.*) He does not see most of his friends anymore, and while he was in a relationship for a little while, that ended. (*Id.* at 1283-84.) He also takes medication for his mental health issues, which has been effective, but he thinks it may not be effective anymore because of how long he has been on it. (*Id.* at 1284-85.) His anxiety medication helps. (*Id.* at 1285.)

- On a typical day, he bathes, takes care of his hygiene, takes his small dog outside every few hours and walks him around the yard, helps his mother with laundry, and loads the dishwasher. (*Id.* at 1285-86.) He can sweep, but only for a few minutes before he needs to sit down and rest before resuming. (*Id.* at 1286.) He can mow the yard with an electric start push mower, again for a few minutes before he needs to sit and rest before resuming. (*Id.*) Minor maintenance around the house he will try and do, otherwise he needs to call a family friend that is a handyman. (*Id.*) He reads Hot Rod magazine. (*Id.* at 1287.) He went to a dirt racetrack last summer and purchased a stadium seat with thicker padding and sat at the top for back support and so he could stand up at times. (*Id.*)

- He could lift 20 pounds, but he would be hurting. (*Id.* at 1289.) He could not lift it continuously for 45 minutes out of an hour. (*Id.*) If he could do it for 15 minutes out of an hour, it would be through determination and he would be hurting. (*Id.* at 1290.) He would need to rest for half an hour before he could do it again. (*Id.*) He could sit for 10 to 15 minutes before needing to stand up and move around. (*Id.* at 1291.) He would need to move around for 10 minutes before he could sit again. (*Id.*)

- He cannot remember what happened at the beginning of a one-hour show. (*Id.* at 1292.) He has had memory issues for years. (*Id.*) He is also hard of hearing. (*Id.* at 1293.)

The VE testified Lynch had past work as a weld technician, metal-stamping laborer, and general warehouse laborer. (*Id.* at 1294-95.) The ALJ then posed the following hypothetical question:

> I would like you to assume that the claimant is capable of working at the light exertional level, except that he could occasionally climb ramps and stairs, but

19

> could not climb ladders, ropes, or scaffolds. He would be capable of occasional stooping, kneeling, crouching, and crawling, and would need to avoid workplace hazards, such as unprotected heights and machinery. He would be capable of routine and repetitive tasks involving only simple work-related decisions and few, if any, workplace changes. He can work in positions that do not require strict production quotas or fast-paced work, such as on an assembly line. And he could have frequent interaction with the general public, coworkers, and supervisors, with no persuasion or conflict resolution responsibilities. Could he perform any of his past work?

(*Id.* at 1296.)

The VE testified the hypothetical individual would not be able to perform Lynch's past work as a weld technician, metal-stamping laborer, and general warehouse laborer. (*Id.* at 1297.) The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as mail room clerk, cafeteria attendant, and office helper. (*Id.*)

The ALJ asked whether the VE's testimony would change if he added the following limitations to the hypothetical: alternating between sitting, standing, or walking every 30 minutes; occasional pushing and pulling, consistent with the exertional limits at the light exertional level; and could not crouch except for what was necessary to go from sitting to standing and vice versa. (*Id.* at 1297-98.) The VE testified the additional limitations would not change his testimony and that the sit, stand, and walk variance "would be consistent with how that work is performed competitively." (*Id.* at 1298.)

In response to additional questioning from the ALJ, the VE testified that in today's economy, time off-task is allowed up to 10-12%; once that threshold is reached or exceeded, the individual was not performing the essential duties in the job description. (*Id.*)

### III.     STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to

20

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 404.1520(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

21

Here, Lynch was insured on his alleged disability onset date, January 6, 2015, and remained insured through December 31, 2020, his date last insured ("DLI").  (Tr. 1228.)  Therefore, in order to be entitled to POD and DIB, Lynch must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2.  The claimant has not engaged in substantial gainful activity since January 6, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: degenerative disc and joint disease of the spine status post fusion and revision surgeries with post laminectomy syndrome; degenerative joint disease of the knees; an adjustment disorder; an anxiety disorder; and a dysthymic disorder (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant would need to alternate between sitting, standing, and walking every 30 minutes.  He could occasionally push/pull consistent with the weight limits of the light exertional level.  The claimant could not crouch, except for which is necessary to move from sitting to standing and vice versa.  The claimant could occasionally climb ramps and stairs and would be precluded from climbing ladders, ropes, and scaffolds.  The claimant could occasionally stoop, kneel, and crawl.  He should avoid exposure to hazards, including unprotected heights and machinery.  The claimant could perform routine and repetitive tasks involving only simple work related decisions and with few, if any workplace changes.  The claimant could work in a setting without strict production quotas and without fast-paced work, such as on an assembly line.

The claimant could have frequent interaction with the general public, coworkers, and supervisors, without persuasion or conflict resolution responsibilities.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on December **, 1964 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404., Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 6, 2015, through December 6, 2019 (20 CFR 404.1520(g)).

(Tr. 1230-50.)

## V.      STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No.

24

11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.      Lynch's Constitutional Challenge

Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019, pursuant to 42 U.S.C. § 902(a).[4]   Section 902(a)(3) provides, "An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office."  *Id*.  The parties agree that that portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove the Commissioner without cause.  (Doc. No. 14 at 10; Doc. No. 16 at 10.)  *See also Seila Law LLC v. Consumer Financial Protection Bureau*, -- U.S. -- , 140 S. Ct. 2183, 2197 (2020) (statutory restriction on the President's ability to remove the head of an agency ("for inefficiency, neglect, or malfeasance") violates the separation of powers and is unconstitutional); *Collins v. Yellen*, -- U.S. --, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional).  The parties disagree as to what effect that unconstitutional removal restriction has on the ALJ's determination of Lynch's disability application.  Lynch argues that he is entitled to remand for a new hearing and decision.  The Commissioner disagrees, asserting that Lynch must show that the unconstitutional removal restriction caused the denial of his benefits claim and that he does not make such a showing.

---

[4]  https://www.ssa.gov/history/saul.html.  Saul is no longer the Commissioner.

In *Seila Law*, the Court found that the unconstitutional removal provision was severable from the other provisions of the relevant statute but did not discuss what a plaintiff must show to obtain relief when challenging actions taken by the head of an agency who derived powers from a statute that included an unconstitutional removal provision.   140 S. Ct. at 2208, 2211.   In *Collins*, the Court took up that discussion and provided guidance regarding the kind of compensable harm a plaintiff must show to be entitled to relief.  141 S.Ct. at 1787-1789.

### 1.   *Collins v. Yellen*

*Collins* involved the Federal Housing Finance Agency ("FHFA"), an agency created by Congress tasked with regulating Fannie Mae and Freddie Mac, two of the country's leading sources of mortgage financing.  141 S.Ct. at 1770.  Pursuant to the statute creating the FHFA, the head of the agency was a Director removable by the President "only 'for cause.'"  *Id*.  Fannie Mae and Freddie Mac shareholders challenged an agreement the FHFA had made with the United States Treasury (the "third amendment"), which channeled money from Fannie Mae and Freddie Mac to the Treasury rather than shareholders.  *Id*. They argued that the removal provision in the FHFA statute was unconstitutional because, by restricting the President's power to remove the FHFA Director, the statute the violated separation of powers.  *Id*. at 1787.  The Court agreed.  *Id*. (citing *Seila Law*, 140 S. Ct. at 2205).  But the Court did not provide the shareholders the remedy that they sought—that "the third amendment must be completely undone"—for the following reasons.

First, the shareholders had sought to undo the third amendment because it was "adopted and implemented by officers who lacked constitutional authority and that their actions were therefore void *ab initio*."  *Id*.  But the Court noted that the third amendment was adopted by the FHFA's Acting Director, whose position did not have the improper removal restriction that the Director's position had had, so the shareholders' attempt to set aside the third amendment "in its entirety" failed.  *Id*. at 1783, 1787.  Next,

26

regarding the shareholders' argument with respect to the actions that Directors had taken to implement the third amendment, the Court reasoned,

> All the officers who headed the FHFA during the time in question were properly *appointed*.  Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.  As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void.

*Id*. at 1787 (emphasis in original).

The Court went on to explain that an unconstitutional provision like the removal restriction could inflict compensable harm, and gave the following examples:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id*. at 1789.  The Court remanded the case for consideration of the shareholder's suggestion that "the President might have replaced one of the confirmed Directors who supervised the implementation of the third amendment, or a confirmed Director might have altered his behavior in a way that would have benefited the shareholder."  *Id*. at 1789.

### 2. Lynch does not show compensable harm and is not entitled to a remand

Defendant asserts, and Lynch does not dispute, that the ALJ who decided his case was not appointed by former Commissioner Saul.  Rather, the ALJ was appointed by Saul's predecessor, then-Acting Commissioner Berryhill.  (Doc. No. 16 at 10; Doc. No. 17 at 4.)  And the parties do not dispute that Berryhill's appointment as Acting Commissioner was not made pursuant to § 902(a)(3); did not contain a "for cause" removal provision; and, thus, was not unconstitutional. (Doc. No. 16 at 10; Doc. No. 17 at 4.)  Accordingly, to the extent Lynch's arguments in his opening brief could be construed as

27

requesting that his case be remanded because the appointment of the ALJ who decided his case was defective because he, in turn, was appointed by Saul, his argument fails.  *See* § 902(b), Deputy Commissioner of Social Security (no removal restrictions for Acting Commissioner); *Collins*, 141 S.Ct. at 1782 (when a statute is silent regarding the President's power to remove an agency head, the officer serves at the President's pleasure; the FHFA statute did not contain removal restrictions on an Acting Director and actions taken by the Acting Director to adopt the third amendment could not be challenged as unconstitutional).

Lynch asserts, "Based on the fact that Andrew Saul's tenure as Commissioner of SSA is unconstitutional, and he was Commissioner at the time of the ALJ decision in this matter, this matter should be remanded for a *de novo* hearing."  (Doc. No. 14 at 11.)  But the fact that the removal restriction in § 902(a)(3) is unconstitutional does not entitle Lynch to a remand for a new hearing and decision in his case.  As the Court in *Collins* found, "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. 141 S.Ct. at 1788 ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment," citing *Seila Law*, 140 S.Ct. at 2207–2211).  Here, Lynch has not provided a basis for concluding that Commissioner Saul lacked the authority to carry out the functions of the office because of the unconstitutional removal provision.

Lynch contends, "The ALJ in this matter decided this case based on regulations promulgated by Mr. Saul when he had no authority to issue the same.  This means that a presumptively inaccurate legal standard was utilized by the ALJ to adjudicate this claim."  (Doc. No. 14 at 10-11.)  Lynch does not cite what regulations Saul promulgated that the ALJ used to decide his case.  Moreover, his argument that Saul had no authority to carry out the functions of office because the removal restriction was unconstitutional

was rejected by the Court in *Collins*.  141 S.Ct. at 1788.  His assertion in his reply brief that the ALJ who decided his case "was under the delegated authority of a Commissioner who had no constitutionally valid legal authority to delegate" (Doc. No. 17 at 1) fails for the same reason.

In his reply brief, Lynch asserts, while Saul was Commissioner, "Social Security modified the way in which musculoskeletal impairments are evaluated (DI 34121.013 and DI 34121.015)." (Doc. No. 17 at 3.)  But POMS DI 34121.013 and 34121.015 became effective in April 2021 and did not impact Lynch's 2015 application or 2020 hearing and decision.  Lynch also asserts that when Saul was Commissioner, "he implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)." (Doc. No. 17 at 3.)  But HALLEX 1-2-3-20, "Acknowledgment of Notice of Hearing," sets forth ways in which the Agency communicates to claimants that it received their notice of hearing forms.[5]  It does not modify the way the ALJs write their decisions.  And, in any event, Lynch does not claim that he suffered any harm as a result of his request for a hearing and his receipt of the Agency's notice scheduling one.  Finally, Lynch argues, "In addition, Plaintiff did not receive a constitutionally valid hearing and adjudication from an ALJ, nor did he receive a constitutionally valid decision from an ALJ.  In addition, Plaintiff did not receive a constitutionally valid adjudication from the Appeals Council." (Doc. No. 17 at 3.)  The basis for these assertions is unclear, and the Court shall not presume or speculate as to the grounds underpinning this argument.  However, to the extent Lynch is arguing that because Saul appointed ALJs when he was serving per the unconstitutional removal restriction, and therefore, the ALJ in this case served in an unconstitutional manner, as discussed above, Lynch does not dispute that the ALJ in his case was not appointed by Saul; therefore, there can be no implication on such a basis that the ALJ

---

[5]  *See* https://www.ssa.gov/OP_Home/hallex/I-02/I-2-3-20.html (last visited 2/28/2022).

who decided his case served in an unconstitutional manner.  Furthermore, as the Supreme Court made clear in *Collins*:

> All the officers who headed the FHFA during the time in question were properly *appointed*.  Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.  As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void.

*Collins*, 141 S.Ct. at 1787 (emphasis in original).  Lynch emphasizes in his reply brief that he is not raising an Appointments Clause challenge.  (Doc. No. 17 at 4.)

Moreover, none of Lynch complaints listed above describe the type of compensable harm stemming from an unconstitutional removal provision that was described in *Collins*.  Lynch does not state that when his application was pending the President was unable to remove Saul from office or believed that he was unable to do so.  *Collins*, 141 S.Ct. at 1789.  Lynch does not describe how he was harmed at the time of the ALJ's decision in November 2020.  His reference to a statement made by President Biden when he terminated Saul (Doc. No. 17 at 4) is also unaccompanied by any description of that statement, the date it was made, and any explanation as to how that statement shows that he suffered compensable harm.

In short, Lynch has not described compensable harm due to the unconstitutional removal provision in § 902(a)(3) under which Saul served as Social Security Commissioner.  His constitutional challenge fails.

**B.    Treating Source Opinion**

**1.    Compliance with Remand Order**

Lynch argues the ALJ "failed to comply with the remand order in this matter" and therefore remand or an award of benefits should occur.  (Doc. No. 14 at 12.)  However, beyond stating that the

matter was remanded for proper evaluation of Dr. Vore's opinion, that, on remand, the ALJ found his opinion entitled to partial weight, and that the ALJ adopted Dr. Vore's limitation that Lynch needed to alternate sitting, standing, and walking every 20 to 30 minutes, Lynch makes no cogent argument as to how the ALJ failed to comply with the remand order. (*Id.* at 12-14.) While Lynch makes a Step Five argument related to the limitation to alternating sitting, standing, and walking every 20 to 30 minutes (*id.* at 14), Lynch fails to develop an argument regarding lack of compliance with the remand order and the Court shall not make such arguments for him.

### 2. Step Five Challenge

Lynch argues that in response to the ALJ's questioning, the VE testified that changing position every 30 minutes "would be consistent with how the light jobs cited were performed competitively." (Doc. No. 14 at 14) (citation omitted). However, in response to questioning from Lynch's attorney, the VE testified "it would depend how much off task the person would be as to whether he could perform the jobs cited." (*Id.*) (citation omitted). Lynch asserts, "This inconsistent testimony failed to satisfy the Commissioner's burden at Step Five . . . ." (*Id.*) Lynch also argues the ALJ erred in finding the testimony of the VE consistent with the DOT when in fact the DOT "does not address the issue of whether the jobs could be performed with the need to change positions every 20 to 30 minutes." (*Id.* at 15.)

The Commissioner responds that the VE's testimony was not inconsistent; rather, in response to different hypotheticals from Lynch's counsel, the VE "repeatedly testified that the amount of time an individual was required to be off task would determine whether a job could be performed." (Doc. No. 16 at 24) (citations omitted). In addition, the Commissioner asserts that, contrary to Lynch's argument, the ALJ asked, and the VE testified, that his testimony was consistent with the DOT, and where his testimony addressed areas not covered by the DOT, "it was based on his 'experience in the labor market; my placing

individuals in employment settings; [and] work site analysis for the Bureau of Worker's Compensation; informational interviews with potential employers . . . ."  (*Id.* at 24-25) (citations omitted).

At Step Five of the sequential disability evaluation, the Commissioner bears the burden in proving work exists in the national economy that a claimant can perform.  "Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications."  20 C.F.R. § 416.966(b).  ALJs "will take administrative notice of 'reliable job information' available from various publications, including the DOT."  SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000).  In addition, as set forth in 20 C.F.R. § 416.966(e), ALJs may use VEs "as sources of occupational evidence in certain cases."  *Id.*  "When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled."  *Id.*  At the hearing level, the ALJ must inquire on the record "as to whether or not there is such inconsistency."  *Id.*  Further, no one source "automatically 'trumps' when there is a conflict."  *Id.*  Rather, the ALJ "must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information."  *Id.*

In response to a hypothetical from the ALJ including a limitation requiring alternating between sitting, standing, or walking every 30 minutes, the VE testified such a limitation would not change the jobs previously identified, as "that would be consistent with how that work is performed competitively." (Tr. 1298.)  In response to a hypothetical from Lynch's counsel where a person could only sit or stand for 10 minutes and would need to walk around for five minutes and leave the workstation, the VE testified the light jobs previously identified would not remain, as he believed "because of the amount of off-task, I don't see how the essential functions are being performed with that variation of the sit, stand, walk."  (*Id.*

32

at 1300.)  When Lynch's counsel changed the hypothetical to 20 to 30 minute intervals, the VE testified, "It's going to be how much off-task it – how much of the work product is affected by that posited change. So, are they sitting for 20 minutes, standing for 20 minutes, and walking for 20 minutes? It's going to be – it's been published in the job description, and, again, it's going to go to the off-task issue."  (*Id.*)  In response to an additional question from Lynch's counsel, the VE testified the light jobs identified could be performed with a sit/stand at will option.  (*Id.* at 1303.)  Lynch's counsel then asked another hypothetical where the person is changing position every 15-20 minutes and would be walking around for three minutes, so a person would be off-task for six minutes an hour, which would be 10% time off task.  (*Id.* at 1305-06.)  The VE testified such a person was reaching the threshold where they would not be performing the essential functions within the job description.  (*Id.* at 1306.)

As Lynch concedes, Dr. Vore opined that he needed to alternate between sitting, standing, and walking at 20-30 minute intervals.  (*Id.* at 373.)  As Lynch further concedes, the ALJ adopted this limitation into the RFC.  (*Id.* at 1235.)  The VE testified such a limitation would not preclude performance of the light jobs identified.  (*Id.* at 1298.)  The fact that the VE provided different answers in response to hypotheticals that changed the frequency of changing the position, specified certain amounts of time a person would be walking, and/or added a requirement that a person leave the workstation does not render the VE's testimony in response to the ALJ's hypothetical – and the only limitation adopted and included in the RFC – unreliable or contradictory.[6]

With respect to Lynch's DOT argument, the ALJ asked the VE on the record whether his testimony was consistent with the DOT.  (*Id.* at 1306.)  The VE testified it was.  (*Id.*)  The ALJ then asked

---

[6] The Court notes that while Lynch cites *Fackler v. Saul*, Case No. 3:20cv790, 2021 WL 3493511 (N.D. Ohio July 16, 2021), in support of her argument "where the testimony casts some doubt on whether Plaintiff could perform the jobs cited" (Doc. No. 14 at 16), the magistrate judge in that case found "no basis for remand based on Plaintiff's Step Five argument."  2021 WL 3493511 at *7, *report and recommendation adopted by* 2021 WL 3492129 (N.D. Ohio Aug. 9, 2021).

33

the VE what his testimony was based on if it addressed areas not covered by the DOT.  (*Id.*)  The VE

testified, "It's based on my experience in the labor market; my placing individuals in employment

settings; work site analysis for the Bureau of Worker's Compensation; informational interviews conducted

with potential employers, also, when I'm placing individuals in employment settings."  (*Id.*)

There is no error.

**C.**     **RFC Challenge**

In his second assignment of error, Lynch asserts, "The ALJ erred in forming the RFC when he

failed to properly evaluate the evidence documenting the combination of Lynch's severe impairments and

the related pain."  (Doc. No. 14 at 16.)  As the Commissioner notes, this argument "combines a Step Two

severity argument with an argument about the ALJ's RFC determination," along with a Step Three

argument that Lynch "met 5 separate listings."  (Doc. No. 16 at 25) (citations omitted).[7]  The Court will

address each of these arguments below.

**1.**     **Step Two**

Lynch argues the ALJ erred in finding Lynch's Sjogren's syndrome and other rheumatological

impairments non-severe when the record established otherwise, and "failed to consider the effects of

Lynch's rheumatological impairments on his ability to perform work at the light level of exertion."  (Doc.

No. 14 at 18.)  The Commissioner argues that the fact the ALJ found some of Lynch's impairments non-

severe is of no import, because the ALJ found certain impairments severe and went on to consider the

combination of Lynch's severe and non-severe impairments in the RFC analysis as required.  (Doc. No. 16

at 26.)

---

[7] The Court notes Lynch's counsel is an experienced Social Security practitioner who regularly practices
in this court.  The Court warns counsel against the continued practice of lumping various challenges to
different steps of the sequential disability evaluation together.

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques.  *See* 20 CFR § 404.1521; Social Security Ruling ("SSR") 96–4p, 1996 WL 374187, at *1 (July 2, 1996).  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  *Id.*

Further, the regulations require "evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment."  SSR 06–03p, 2006 WL 2329939, at *2 (Aug. 9, 2006);[8] 20 C.F.R. § 404.1513(a).  "[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone."  SSR 96–4p, 1996 WL 374187, at *1.  Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings."  SSR 96–4p (footnote omitted).  *See also* 20 C.F.R. § 404.1529(b) ("Your symptoms . . .  will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present.").  *See also Torrez v. Comm'r of Soc. Sec.*, No. 3:16CV00918, 2017 WL 749185, at *6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec.*, 2:15-cv-3103, 2017 WL 655402, at *8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919

---

[8] SSR 06-03p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* 82 Fed. Reg. 15263 (March 27, 2017).  As Lynch's application was filed in June 2015, this Court applies the rules and regulations in effect at that time.

(N.D. Ohio March 30, 2017).  The claimant bears the burden of establishing the existence of a medically determinable impairment.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require.").  *See also Kavalousky v. Colvin*, No. 5:12-CV-2162, 2013 WL 1910433, at *7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of Social Security regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . .."  20 CFR § 404.1520(c).  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id*.

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n.2, intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184 at *5 (July 2, 1996).  This is because "[w]hile a 'not severe'

36

impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id*. "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id*.

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009). The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least one severe impairment) and a claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony*, 266 F. App'x at 457.

A careful review of the ALJ's decision in this case reveals the ALJ considered all of Lynch's impairments, both severe and non-severe, in the RFC analysis. (Tr. 1236-48.) There is no error.

### 2. Step Three

In a vague and disjointed manner, Lynch asserts the ALJ erred by failing to consider the combination of impairments of Listings 1.02, 1.04, 12.04, and 12.06. (Doc. No. 14 at 25-28.) In addition, Lynch asserts that the ALJ erred in evaluating Listings 1.02 and 1.04 as Lynch "was unable to ambulate effectively as required by the applicable Listing as he needed to change position at least every 30 minutes." (*Id.* at 27.) Lynch further argues the ALJ erred in evaluating Listings 12.04 and 12.06, as he interprets the evidence as showing marked limitations in at least two of the "B" criteria. (*Id.* at 25-27.)

37

The Commissioner argues Lynch waived his Listing arguments, and even if not waived, such arguments fail.  (Doc. No. 16 at 26-27.)

First, Lynch's listing arguments are not well-taken, as counsel – who represented Lynch at the administrative level after remand – argued to the ALJ that this was a Step Five case.  (Tr. 1228, 1268-69.) With respect to Lynch's argument that the ALJ failed to consider the combination of his impairments, the ALJ specifically found that Lynch's impairments *or combination of impairments* did not meet or medically equal the listings.  (Tr. 1233.)  The ALJ's decision demonstrates that the ALJ considered Lynch's combination of impairments as required.  (*Id.* at 1233-34.)  "[T]he fact that each element of the record was discussed individually hardly suggests that the totality of the record was not considered, particularly in view of the fact that the ALJ specifically referred to 'a combination of impairments' in deciding that [the claimant] did not meet the 'listings.'"  *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  *See also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 931 (6th Cir. 2007) ("Further, the ALJ's decision reflects a comprehensive examination of Despins' medical impairments and explicitly concludes that Despins 'did not have any impairment or impairments that significantly limited his ability to perform basic work related activities.  That the ALJ may have discussed Despins' impairments individually 'hardly suggests that the totality of the record was not considered.'") (quoting *Gooch*, 833 F.2d at 592)).

Listings 1.02 and 1.04 both require an "inability to ambulate effectively."  20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.02, 1.04.  Listing 1.00(B)(1)(b)(1) defines an inability to ambulate effectively as "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."  Lynch's argument that he meets this requirement by needing to alternate positions every 30 minutes is contradicted by the language of the regulation.  Furthermore, Lynch testified he did not use an assistive device.  (Tr. 1291.)

38

Turning to Lynch's argument regarding Listings 12.04 and 12.06, the ALJ analyzed Lynch's mental impairments at Step Three, which included both positive and negative findings, and explained the reasoning for his findings for each of the "paragraph B" criteria.  (Tr. 1233-34.)  At bottom, Lynch's argument is nothing more than a request for this Court to reweigh the evidence, which it cannot do.  While Lynch interprets the records differently, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  There is no error.

### 3.    RFC

The remainder of Lynch's RFC arguments consist of an argument regarding Lynch's pain (addressed below) and a single sentence in which, without further argument, Lynch asserts that "The ALJ erroneously based his finding that Lynch could perform work at the light level of exertion on the opinions of the reviewing physicians from November 2015 and February 2016 (Tr. 71-73 and 89-90) along with his interpretation of the statement from Dr. Vore."  (Doc. No. 14 at 23.)  It is not for this Court to make Lynch's arguments for him.  The Court finds any medical opinion challenge waived for lack of development. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived").

### D.    Credibility Challenge

Lynch argues the ALJ erred by failing to "properly evaluate the medical evidence and make a defensible determination as to whether Lynch's testimony was credible."  (Doc. No. 14 at 31.)  Lynch

39

points to the fact that he only failed to attend a few treatment sessions in 2015, that although the ALJ noted there was no treatment in 2018, his subsequent claim record included 2018 treatment records, and 2015 and 2016 function reports Lynch completed.  (*Id.* at 31-32.)  The Commissioner responds the ALJ "appropriately evaluated" Lynch's subjective symptoms.  (Doc. No. 16 at 28.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[9] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[10] determination of the individual's statements based on the entire case record.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's

---

[9] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the November 13, 2020 hearing.

[10] SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence."  SSR 16-3p, 2016 WL 1119029, at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'"  *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

"decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[11]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Lynch's testimony and other statements regarding his symptoms and limitations.  (Tr. 1235-37.)  The ALJ determined Lynch's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.* at 1237.)  However, the ALJ found his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision.  (*Id.*)  Specifically, the ALJ found as follows:

---

[11] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

41

- Medication was helping.

- Lynch did not require an assistive device.

- No knee joint instability.

- Normal motor bulk, tone, and strength, intact sensation, normal motor functioning, normal gait, and the ability to heel and toe walk.

- No bowel or bladder control issues, no balance issues, and no falls.

- No leg pain after 2015 revision surgery.

- In May 2017, he could bend forward and almost touch his toes, and he could lift a 25-pound chair, although not repetitively.

- No hospitalizations or emergent treatment.

- Some improvement from facet injections.

- Improvement from ablation treatment.

- No spinal instability.

- Continued independence with activities of daily living.

- Logical thought processes.

- No suicidal or homicidal ideation.

- Normal speech.

- Cooperative behavior.

(Tr. 1237-42.)

The ALJ further found:

> While the claimant reported ongoing back pain after his 2015 operative procedure, the record supports the claimant evidenced no recurrent neurological deficits. The claimant continued to show intact strength, motor functioning, muscle bulk, and he continued to ambulate with a normal gait and station. The record supported no spinal instability or atrophy in the extremities associated

42

with his back condition. The claimant required no assistive devices or ambulatory aids. As discussed within the decision, the claimant continued to engage in independent routine activities of daily living.

* * *

While the claimant reported ongoing mental health conditions and symptoms, the record supports his treatment with providers, specifically mental heath providers/counselors was not consistent. The claimant engaged in intermittent counseling intervention and was taking Paxil medication, generally prescribed by his primary care physician. The record supports his symptoms were admittedly generally controlled with the use of the conservative treatment modalities. The record supports despite any depression or other symptomology, he retained the ability to engage in routine activities of daily living independently. Further, the record supported no recurrent emergent treatment for acute mental symptom exacerbations and did not evidence any mental health hospitalizations for periods of mental instability.

* * *

In addition to the general lack of objective evidence, the evidence of record does not support his subjective complaints. The claimant's daily activities are not restricted to the extent that he would be precluded from the range of work assessed herein. During his first hearing, the claimant reported he was capable of driving and would perform short errands daily (Testimony). He stated he continued to go to the grocery store (Testimony). The claimant stated that he helps with cooking and laundry, as well as general cleaning, dusting, taking out the trash, and sweeping (Testimony). The claimant reported he could push mow his grass (Testimony). The claimant reported that he could independently care for his personal needs, including his hygiene and grooming (Exhibit 4E). The claimant reported that he can leave his home unaccompanied and manage his own finances (Exhibit 4E). The claimant reported being able to watch television and make trips to the local gas station (Exhibit 4E). During his most recent hearing, the claimant reported he could take care of his dog and continued to perform some household chores, such as washing dishes and using a sweeper (Testimony). The claimant reported that he enjoys reading magazines (Testimony). The claimant reported he could complete minor maintenance within his home (Testimony). He reported talking and texting on the phone to others (Exhibit 4E). While these activities are not synonymous will remunerative full time work, the undersigned finds these activities support the above assessed functional limits.

The record contains inconsistent statements. The claimant reported a limited attention span and memory issues; however, the record supports intact memory (Exhibit 29F/152; 30F). The claimant reported right hip pain; however, the

43

record does not support any objective testing or diagnostic testing related to a
right hip condition. The claimant reported he was significantly limited in lifting
as well as standing and walking. His self reported limitations are inconsistent
with the objective evidence of record as discussed above, showing normal
strength, normal muscle tone and bulk, intact gait, and an ability to lift a chair of
approximately 25 pounds. The claimant reported issues interacting with others
because of pain, but the record was devoid of any issues leaving his home
unaccompanied. The claimant reported being limited in the performance of
postural activities; however, the claimant testified that he could perform routine
activities requiring postural movements, such as cleaning, washing dishes,
cooking, washing clothes, sweeping, and taking out the trash. The claimant's
reported back pain and lifting limits are not entirely consistent with the record
supporting he could clean moss off a shed roof, was able to perform work under
his kitchen sink, could mow his own grass, including emptying grass clippings,
and could pick up wood and sticks in his yard (Exhibit 15F; 19F/8, 14, 21;
28F/44).

The claimant reported needing to nap a few times a week during his initial
hearing and subsequently reported needing daily naps. While he reported such
fatigue and daily napping at hearing, the record was devoid of any recurrent
reports of daily napping to his treatment providers. The claimant reported he
could no longer hear some sounds and had some issues with his hearing;
however, the record supported his hearing was generally normal with the use of
hearing aids. He engaged in normal conversation with medical providers and the
judges and his attorneys at hearing without noted deficits. While the claimant
reported a history of near daily headaches, he admitted they were situationally
related to his work activity/stress, noting they had resolved after he stopped
working. The record supported no routine documentation of daily headaches.
The claimant was not prescribed any routine headache medications and was not
referred to headache specialists. The record supported no invasive treatment
such as Botox injections and the claimant was not keeping a headache log or
journal documenting breakthrough headache symptomology. The claimant did
not require any emergent treatment for headaches described as intractable or
status migranosous. The claimant reported some neck pain; however, the record
did not support any objective imaging of the neck documenting serious
degeneration. The claimant received only conservative treatment from a
chiropractor for his neck symptoms. The claimant continued to use his upper
extremities for routine activities, such as picking up wood, cleaning, preparing
meals, driving, independently caring for his personal needs, mowing the lawn,
and washing dishes/laundry, as well as sweeping without significant reported
problems/deficits. While he reported attention issues, the record supports he
continued to operate a motor vehicle, which requires significant and sustained
attention/concentration. The record did not support reports of confusion while
driving nor did the record document evidence of accidents with the claimant as
the driver. While the claimant reported ongoing issues with standing and

44

walking, it should be noted the claimant continued to evidence, as discussed above, normal gait, station, muscle bulk, and muscle tone. The claimant required no assistive devices or ambulatory aids (either before or after surgical intervention). The claimant reported he was generally unhappy; however, the record supports his mental symptoms were generally well controlled with the use of Paxil medication and counseling intervention. The claimant reported receiving little relief from spinal injections; however, the record supported the claimant did receive relief from post surgical pain management treatments, as discussed above, including injections and ablation treatments. The claimant reported oral medications did not work for his symptoms; however, he received some symptom relief in his muscle spasm and tightness with oral medications. The claimant reported dry eyes and mouth; however, he did not report that either condition affected his ability to engage in work related activities. Further, recommended treatment for both symptoms was nothing more than conservative over the counter mouthwash and eye drops.

The record also documents non-compliance. The claimant did not attend scheduled treatment sessions (Exhibit 1F/28). The claimant no showed to multiple physical therapy sessions (Exhibit 2F/3). While the claimant missed scheduled treatment sessions there were no reports of insurance lapses or other problems associated with his inconsistent attendance.

(*Id.* at 1240, 1242-44.)

The Court finds substantial evidence supports the ALJ's assessment of Lynch's subjective complaints. The record evidence, as noted by the ALJ, is not entirely consistent with Lynch's allegations of disabling conditions. (*Id.* at 1240-44.) Contrary to Lynch's allegations, the ALJ credited some of Lynch's subjective symptoms but did not accept them to the extent alleged by Lynch because of findings on examinations and his daily activities, factors to be considered under the regulations. (*Id.*) It is clear the alleged lack of treatment in 2018 was only one factor the ALJ considered in his subjective symptom analysis. (*Id.*) An ALJ can consider a claimant's activities of daily living when assessing symptoms. *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) ("Although the ability to do household chores is not direct evidence of an ability to do gainful work, see 20 C.F.R. § 404.1572, '[a]n ALJ may...consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.'") (internal citations omitted)). In addition to resolving conflicts

in the medical evidence, the ALJ used Lynch's activities of daily living to partially discount his testimony regarding the level of severity of his symptoms.  *See Phillips v. Comm's of Social Sec.*, No. 5:20 CV 126, 2021 WL 252542, at *10 (N.D. Ohio Jan. 26, 2021).  Furthermore, the ALJ's extensive discussion of the relevant medical evidence included several findings that undercut a finding of disability.  (Tr. 1240-44.)

### VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: March 2, 2022                              *s/ Jonathan Greenberg*
                                                  Jonathan D. Greenberg
                                                  United States Magistrate Judge

46